RECEIVED
IN LAKE CHARLES, LA

APR 1 0 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| HAROLD GLEN RHODES AND MAURINE STELLY RHODES | : | DOCKET NO. 05 CV 0099 |
| VS. | : | JUDGE MINALDI |
| UNITED STATES DEPARTMENT OF AGRICULTURE | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the court is an action for judicial review of a final decision by the Farm Service

Agency ("FSA" or "the Agency") of the United States Department of Agriculture ("USDA")

finding the Appellants, Harold Glen Rhodes and Maurine Stelly Rhodes ("the Rhodes")

ineligible for payments previously received under a Production Flexibility Contract for Farm

Serial Number 2591 in Sulphur, Louisiana. Review is governed by the Administrative Procedure

Act (APA), 5 U.S.C. § 701, *et seq.* The parties have filed cross-motions for summary judgment

[docs. 15 & 17]. Having considered the administrative record, briefs, and relevant law, the

Rhodes' motion for summary judgment [doc. 17] will be GRANTED, the USDA's motion for

summary judgment [doc. 15] will be DENIED, and the USDA's final decision will be reversed

and remanded.

### I. Background

The Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104-127 (the

"1996 Farm Bill"), allowed growers of eligible crops in 1995 to enter into Production Flexibility

Contracts ("PFC") with the Commodity Credit Corporation ("CCC") for the years 1996 through

1

2002. 7 U.S.C. § 7211. Farmers who signed a PFC and complied with its terms received payments for each fiscal year that they participated in the program. *Id.*

On July 10, 1996 the Rhodes signed a Commodity Credit Corporation Form CCC-478 "Production Flexibility Contract" enrolling their farm in the PFC program for a seven year period. *Case Record for NAD Case No.2004S000340* ("Rhodes C.R."), at 4. The PFC forms signed by the Rhodes state that the terms and conditions of the PFC are contained in the CCC-478 Appendix. The CCC-478 Appendix warns that the PFC shall be terminated with respect to a producer or owner whose interest in the crops or land on the farm is transferred. By signing the PFC's, the Rhodes acknowledged that they had received copies of the CCC-478 Appendix and had notice of the provisions contained therein.

On October 31, 2002, Dr. Rhodes went to the FSA's county office in Lake Charles to begin the process of enrolling the land subject to the PFC in the 2002 Direct and Counter-Cyclical Program.[1] At that time, he alleges that he first became aware that the Agency's files did not reflect certain land transfers and transactions he had made since 1996, which altered his farm's base acreage. *Rhodes C.R.*, at 4. He abruptly left the office and later informed FSA of the errors. *Id.* In January 2003, the Rhodes submitted evidence of thirteen unreported transactions which had occurred between 1996 and 1998. *Id.* Dr. Rhodes took the position, however, that

---

[1] *See* 7 U.S.C. §§ 7911-7918. Authorized by the Farm Security and Rural Investment Act of 2002 (2002 Farm Bill), the 2002 Direct and Counter-Cyclical Program provides payments to eligible producers on farms enrolled for the 2002 through 2007 crop years. *Id.*

these transactions did not alter the base acreage of the farm. *Id.*

After reviewing the Rhodes' supporting documents and hearing their position, the county office determined that there was a reduction in the base acreage affecting the farm. *Id.* The Rhodes appealed this determination to the FSA Calcasieu-Cameron County Committee (the "County Committee"). *Id.* After meeting in person on December 16, 2003, the County Executive Director notified the Rhodes on January 8, 2004, that the County Committee had properly determined that the unreported transactions resulted in a reduction in the base acreage of their farm. *Id* at 5. On January 16, 2004, the County Director further notified the Rhodes that because they had failed to meet the succession-in-interest provisions of their PFC by failing to file timely the paperwork for these transactions, all payments made to them during the years 1996 to 2002 must be refunded to the Agency with interest. *Id.*

The Rhodes then appealed both determinations to the National Appeals Division. *Id.* In that appeal, the Hearing Officer again determined that the Rhodes had breached their contract by failing to report transactions which divested them of portions of the farmland subject to the PFC.[2] Despite acknowledging that only $38,3331.00 of funds paid to the Rhodes under the PFC was unearned, the Hearing Officer also upheld the prior determination that, as a result of the breach, the Rhodes lost the right to receive *any* payments under the contract and would have to return the entire $446,843.32 already received. *Id* at 5. The Hearing Officer's decision was subsequently reviewed and affirmed by the NAD Director who, pursuant to his authority under 7 C.F.R. §

---

[2] *Rhodes C.R., Appeal Determination on Remand*, at pp. 4-5. The Hearing Officer also affirmed the County Committee's determination that the Rhodes' unreported transactions altered the base acreage of the farm. However, because the Rhodes no longer contest this issue, the court has not included an analysis of the statutes, regulations, and portions of the record relating to the Agency's base acreage determinations.

11.9(e) also evaluated and denied the Rhodes' request for equitable relief to retain all but the overpayment of $38,331.00.[3]

The Rhodes now seek judicial review of the NAD Director's final decision requiring a refund of all of the proceeds received by the Rhodes under the PFC. In addition, the Rhodes request that this court restrain the FSA from implementing the NAD decision by offsetting the total debt from other FSA program payments due to the Rhodes in 2005. *See Appellants' Petition*, at p. 3.

## II. Law

### A. Standard of Review Under FRCP 56

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986). A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510;

___

[3] Pursuant to 7 C.F.R. § 11.3(b), the NAD has no jurisdiction over an agency's regulations and consequently the Rhodes' appeal was limited to contesting the factual basis and the FSA's application of its regulations and programs to the facts of their case as well as a request for equitable relief. The NAD appeals process did not provide the Rhodes an opportunity to seek review of statutes or USDA regulations issued under Federal Law.

*Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir.1999).

When the nonmoving party has the burden of proof on an issue, the movant must state the

basis for the motion and identify those portions of the pleadings, depositions, admissions,

answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine

issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman,* 954 F.2d

1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

A mere conclusory statement that the other side has no evidence is not enough to satisfy a

movant's burden. See *Celotex,* 477 U.S. at 328, 106 S.Ct. at 2555.

Once the movant has shown the absence of material factual issues, the opposing party has

a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there

is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514;

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The Court must view the evidence introduced and all

factual inferences from the evidence in the light most favorable to the party opposing summary

judgment. *Eastman Kodak v. Image Technical Services,* 504 U.S. 451, 456-58, 112 S.Ct. 2072,

2077, 119 L.Ed.2d 265 (1992); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. However, a party

opposing summary judgment may not rest on mere conclusory allegations or denials in his

pleadings. Fed.R.Civ.P. 56(e); see also *Topalian,* 954 F.2d at 1131.

### B. Standard of Review under the APA

Judicial review of administrative decisions arising under the Federal Agriculture

Improvement and Reform Act of 1996 is governed by the standard established in the

Administrative Procedure Act, 5 U.S.C. § 706. Under that standard, the Agency's final decision

will be upheld unless it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Macktal v. United States Dep't of Labor,* 171 F.3d 323, 326 (5th Cir.1999); 5 U.S.C. § 706(2)(A). When reviewing an agency decision based on this standard, the reviewing court "...must assure itself that the agency considered the relevant factors in making a decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it; but, [the reviewing court] cannot substitute [its own] judgment for that of the agency." *Public Citizen, Inc. v. U.S.E.P.A.* 343 F.3d 449 (2003), 455-456 (C.A.5,2003) (citing *Texas Oil & Gas Ass'n v. EPA,* 161 F.3d 923, 934 (5th Cir.1998)). In other words, a court is not permitted to impose its own construction of a statutory provision for a reasonable interpretation made by the agency. *United States v. Shimer,* 367 U.S. 374, 382-83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

It is well established that "judges review administrative action on the basis of the agency's stated rationale and findings." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,* 751 F.2d 1287, 1325 (D.C.Cir.1984), cert. denied, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). The agency must articulate the reasons why it has exercised its discretion in a given manner and action must be upheld if its reasons and policy choices satisfy minimum standards of rationality. *T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973). A decision is arbitrary or capricious only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Wilson v. U.S. Dep't of Agric.,* 991 F.2d 1211, 1215 (5th Cir.1993). The job of the reviewing court, therefore, is only to determine whether the administrative findings are supported by substantial evidence of the record as a whole. *Bank of Commerce,* 484 F.2d at 289.

Further, review of agency interpretations of statutory provisions is governed by the two-step process set forth in *Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the reviewing court must inquire whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear and unambiguous, the court, as well as the agency, must apply the express provisions of the statute. *Id.* at 842-43, 104 S.Ct. at 2781-82. Second, if the statute is ambiguous, then the court should uphold the agency's reasonable and plausible interpretation of the statute. *Chevron, U.S.A., Inc.*, 467 U.S. at 842-43, 104 S.Ct. at 2778. Under this second step, the agency's interpretation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2778. The interpretation should be upheld if reasonable, and it is not necessary that the agency's interpretation be the sole interpretation or one that the court would reach if it were considering the matter initially. *Enron Oil and Gas Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir.1992) (citation omitted), *cert. denied*, 510 U.S. 813, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993).

### III. Analysis

The USDA argues that 7 C.F.R. § 1412.201 mandates termination of the entire PFC and a refund of all funds paid under that PFC for succession-in-interest violations. Subsections (b) and (c) of that regulation read:

> (b) A transfer (or change in) the interest of an owner or producer subject to a contract in the contract acreage covered by the contract *shall* result in the termination of the contract *with respect to the acreage*, unless the transferee or owner of the acreage agrees to assume all obligations under the contract. *The termination shall be effective on the date of the transfer or change.* [emphasis added]

(c) All producers sharing in the contract payments on a farm whose payment shares have not been designated for a fiscal year must sign the contract designating payment shares and provide supporting documentation as specified in parts 12, 1400, and 1405 of this title no later than August 1 of the fiscal year to be eligible to earn a contract payment in that fiscal year. If all producers have not signed the contract by this deadline, no producers on the contract will be eligible for a payment for that farm for that fiscal year.

7 CFR § 1412.201 (b) and (c). FSA Handbook 1-PF, Paragraph 326 further provides that a producer or owner must inform the appropriate FSA County Committee of a change in interest no later than August 1 of the current fiscal year. If a change in interest occurs requiring a succession to CCC-478, but the County Committee is not informed of the change by August 1 of the current fiscal year, neither the predecessors nor the successors are eligible for the current and future year PFC payments on the farm, and the shares are reduced to zero for current and future years with respect to the predecessors. *FSA Handbook 1-PF, Paragraph 326B.* If a successor does not succeed to the PFC by August 1, any payment issued to the predecessor shall be refunded, plus interest, from the date of disbursement. *FSA Handbook 1-PF, Paragraph 326D.*

If § 1412.201 and the guidelines drafted thereunder govern, then it is clear that the Rhodes must forfeit all PFC payments received. What is not clear, however, is whether the FSA had authority to implement such a draconian penalty for succession-in-interest violations. The statutory analog to § 1412.201 appears at 7 U.S.C. § 7217 but is devoid of any mandate to terminate PFC's in their entirety for such violations. Subsection (a) of that statute provides:

Except as provided in subsection (c) of this section, a transfer of (or change in) the interest of an owner or producer subject to a contract in the contract acreage covered by the contract *shall* result in the termination of the contract *with respect to the acreage*, unless the transferee or owner of the acreage agrees to assume all

obligations under the contract.[4] *The termination shall be effective on the date of the transfer or change.* [emphasis added]

7 U.S.C. § 7217(a). By its express terms, § 7217 limits mandatory termination to the acreage improperly transferred or changed. Any interpretation which broadens termination to include the entire contract acreage would render the language "with respect to the acreage" superfluous.[5] Further, the language in § 7217 that "termination shall be effective on the date of the transfer or change" indicates that Congress intended the remainder of the PFC to survive. Otherwise, the effective date of the termination would be meaningless when, as here, the Agency terminates the entire PFC and deems the owner/producer retroactively ineligible to receive payments already paid out under the contract.[6]

Put in terms of the analysis set forth in *Chevron*, the Agency fails at step one. Congress

---

[4] The exception in subsection (c) only applies if an owner or producer dies, becomes incompetent, or is otherwise unable to receive the contract payment. 7 U.S.C. § 7217(c).

[5] Under the 1996 Farm Bill, "Contract Acreage" is a defined term meaning "one or more crop acreage bases established for contract commodities under title V of the Agricultural Act of 1949 (7 U.S.C. § 1461 et seq.) that would have been in effect for the 1996 crop (but for suspension under section 7301(b)(1) of this title)." 7 U.S.C.A. § 7202 (4). Having defined contract acreage to mean, in essence, all the acreage included within a PFC, it follows that the word "acreage" by itself must mean something different. The statute's subsequent condition that the "transferee or owner of the acreage agree[] to assume all obligations under the contract" to avoid termination makes it clear that Congress was referring only to the improperly divested acreage, as the successor would have no authority to assume obligations under the PFC with respect to land not included in the transfer.

[6] Also of note is that subsection (b) of § 7217 entitled "Modification," specifically states that "at the request of the transferee or owner, the Secretary may modify the contract if the modifications are consistent with the objectives of this subchapter, as determined by the Secretary." Thus, it would appear that Congress intended to give the Agency discretion, in some cases, to modify rather than terminate the PFC even with respect to the transferred acreage.

has directly and clearly spoken to the issue of contract termination for failure to report changes in interest and by requiring termination of PFC's in their entirety for such violations, the Agency's regulation is inconsistent with Congressional intent. The Agency has cited no statute, nor has the court been able to find one on its own, which authorizes termination of any portion of the PFC beyond that which was affected by the improper transfers.[7] Thus, by refusing to consider any alternative to mandatory termination of the PFC in its entirety, not only did the Agency effectively deprive the Rhodes of the type of review contemplated by the statutory scheme, the agency also exceeded its authority.

The Agency's regulation contradicts the clearly expressed intent of Congress to terminate PFC's for succession-in-interest violations only with respect to the improperly divested land. Therefore, the final agency decision is not a reasonable interpretation of an ambiguous statute

---

[7] The record contains one other reference to a statutory justification for § 1412.201(c) but it is insufficient to justify the regulation's patent contradiction with the language of § 7217. The statute authorizing PFC's in the 1996 Farm Bill required FSA to issue PFC payments by the end of each fiscal year. Accordingly, the Agency asserts that a correct designation of shares had to be on file in advance of this statutory deadline in order to allow FSA to read active PFC's and pay designated shares.

The Agency's own payment deadlines arguably serves as further statutory justification for terminating PFCs with respect to the unreported acreage (although in truth no further justification is necessary given the clear language in § 7217 supporting such a penalty). The Agency's ability to make timely payments under PFC's would be unaffected if succession-in-interest violators remained entitled to payments for the retained portions of their land. As proof of this, the court need not look any further than this case. The Rhodes' failure to report 13 land transactions until 2002 did not impede the Agency's ability to make timely payments at the end of each fiscal year from 1996 to 2002. Thus adherence to the statutory payment deadline cannot be what the penalty of § 1412.201(c) was meant to address. Rather, it is manifest to the court that the Agency's concern is with the accuracy of the designation of shares on record so that it may avoid making payments to owners or producers who are no longer eligible. It is understandable that the Agency would want to ensure the accuracy of both its records and subsequent payments. However, the agency cannot address this concern by imposing a penalty which goes beyond that contemplated by § 7217.

and is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Accordingly, the USDA's final decision will be reversed and remanded.

### IV. Conclusion.

Upon review of the administrative record, the Court has determined that the Rhodes' motion for summary judgment [doc. 17] will be GRANTED, the USDA's motion for summary judgment [doc. 15] will be DENIED, and the USDA's final decision will be reversed and remanded with instructions for the Agency to act in accordance with 7 U.S.C. § 7217.

Lake Charles, Louisiana, this 31 day of March, 2006.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

11